

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed December 23, 2019**

_____
**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 18-44642-ELM-13 |
| JOHNNY WYNN TERRY, | § | |
| | § | Chapter 13 |
| Debtor. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the Court is the *Motion for Sanctions*[1] (the "**Sanctions Motion**") and *Motion to Compel Turnover*[2] (the "**Turnover Motion**") filed by Johnny Wynn Terry (the "**Debtor**"), the chapter 13 debtor in this case. Pursuant to the Sanctions Motion, the Debtor seeks an award of sanctions against Toucan Properties, Inc. ("**Toucan**"), the Debtor's former landlord, for Toucan's alleged violation of the automatic stay[3] of the Bankruptcy Code[4] in taking possession of certain of the Debtor's personal property located at the home that he leased from Toucan and in thereafter

---

[1] Docket No. 40.
[2] Docket No. 39.
[3] 11 U.S.C. § 362(a).
[4] 11 U.S.C. § 101, *et seq.* (the "**Bankruptcy Code**").

wrongfully withholding the property from the Debtor for over a month. More specifically, because certain of the items of property were allegedly never returned to the Debtor or were returned in a damaged state, the Debtor seeks an award of damages for the loss of such property. The Debtor also seeks an award of punitive damages. Pursuant to the Turnover Motion, the Debtor seeks Toucan's turnover of any property that has not yet been returned to the Debtor.

Toucan has timely responded to both motions.[5] First, in response to the Sanctions Motion, Toucan asserts that there was no stay violation because the stay had already been lifted under the terms of an agreed order by the time of the complained of actions. Alternatively, Toucan asserts that even if the stay was violated, there was no *willful* violation of the stay and therefore no basis for an award of damages. In this regard, Toucan asserts that when its principals inspected the leased home after providing notice to vacate, "nothing was in boxes or otherwise stored in a way that suggested it was to be moved" and, thus, Toucan believed that the Debtor and his wife had vacated the home.[6] Consequently, Toucan's packing up of the remaining belongings and moving of them to a storage facility was justified, according to Toucan.[7] Toucan further notes that the parties ultimately reached agreement for Toucan to return the property to the Debtor's new residence, thereby allegedly eliminating any harm to the Debtor.[8] Second, with respect to the Turnover Motion, for the same reasons as laid out in the Sanctions Response,[9] Toucan asserts that its actions were justified and that, based upon the agreement reached for Toucan's return of the

---

[5] *See* Docket Nos. 51 (the "**Turnover Response**") and 52 (the "**Sanctions Response**").

[6] Sanctions Response, ¶ 6.

[7] *See id.*, ¶ 7.

[8] *See id.*, ¶ 8.

[9] *See* Turnover Response, ¶¶ 4-6.

property, any order for turnover should do nothing more than simply "confirm[ ] the agreement of the parties with respect to turnover of the property."[10]

On April 8, 2019, the motions came on for an evidentiary hearing before the Court at the conclusion of which the Court took the matters under advisement. Thereafter, the parties submitted post-trial briefing at the request of the court,[11] and the Debtor separately filed the *Affidavit of Daniel S. Wright in Support of Debtor Johnny Wynn Terry's Application for Attorney Fees*[12] (the "**Wright Declaration**") to evidence the attorneys' fees and expenses sought for recovery under the Sanctions Motion.[13] Having now considered the Sanctions Motion, the Turnover Motion, the Sanctions Response, the Turnover Response, the evidence introduced by the parties, including the Wright Declaration, other items in the record identified herein, the arguments of counsel, and the parties' respective post-trial briefs, the Court issues its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52, as made applicable to these proceedings pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.[14]

### JURISDICTION

The Court has jurisdiction of the Sanctions Motion and Turnover Motion pursuant to 28 U.S.C. §§ 1334 and 157 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc (Miscellaneous Rule No. 33)* of the United States District Court for the Northern District of Texas. Venue of these proceedings in the Northern District of Texas is proper under 28 U.S.C.

---

[10] *See id.*, ¶ 6 and prayer for relief.

[11] *See Brief of the Debtor in Support of Motion for Turnover and Motion for Sanctions* [Docket No. 66]; *Toucan Properties, Inc.'s Memorandum of Law* [Docket No. 73].

[12] Docket No. 67.

[13] With the consent of Toucan, the Debtor was given the opportunity after trial to submit a verified statement regarding such fees and expenses, subject to Toucan's right to object to the amount and reasonableness of such fees and expenses.

[14] To the extent any of the following findings of fact are more appropriately categorized as conclusions of law or include any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law are more appropriately categorized as findings of fact or include any findings of fact, they should be deemed as such.

§ 1409. The Sanctions Motion proceeding constitutes a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (O). The Turnover Motion proceeding constitutes a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(E). Pursuant to 28 U.S.C. § 157(b)(1) the Court has the statutory authority to enter final orders on the motions and based upon the nature of the matters there are no *Stern*-based Constitutional limitations[15] to the Court doing so.

## FINDINGS OF FACT

### A.     The Prepetition House Lease, Default and Bankruptcy Filing

1.      Toucan is the owner-lessor of real property located at 1130 Pebble Beach Drive, Mansfield, Texas 76063 (the "**Mansfield Property**").[16] The principals of Toucan are Mark Daniels ("**Mr. Daniels**"), its President, and Mary Daniels ("**Mrs. Daniels**" and together with Mr. Daniels, the "**Daniels**"), its Office Manager who handles all of the day-to-day rental operations.

2.      On February 15, 2017, the Debtor and his wife Cynthia Terry[17] ("**Mrs. Terry**" and together with the Debtor, the "**Terrys**") entered into a residential lease with Toucan for the Terrys' rental of the Mansfield Property (the "**Lease**").[18] The Lease provided for a definitive lease term of February 15, 2017 through August 31, 2018, with automatic renewal on a month-to-month basis thereafter until the time of the Terrys' or Toucan's provision of at least 60 days' written notice of termination.[19] At or around the end of the definitive term, the Terrys and Toucan entered into an Extension of Residential Lease pursuant to which the Lease was amended, effective September 1,

---

[15] *See Stern v. Marshall*, 564 U.S. 462, 131 S. Ct. 2594 (2011).

[16] *See* Docket No. 19 (Toucan Motion for Relief from Stay, hereafter referred to as the "**Stay Relief Motion**"), ¶ 4; Docket No. 28 (Debtor's Answer to Stay Relief Motion, hereafter referred to as the "**Stay Relief Answer**"), ¶ 1.

[17] Formerly Cynthia Smith, the name that Mrs. Terry went by at the time of execution of the Lease.

[18] *See* Exhibit 11 (Lease); Stay Relief Motion, ¶ 5; Stay Relief Answer, ¶ 1.

[19] *See* Exhibit 11 (Lease), ¶¶ 3.A. and 4.

2018, to (among other things) change the end of the term to "the first of each month" with the Lease's automatic monthly renewal provisions to continue to apply.[20]

3. In November 2018, the Terrys defaulted under the terms of the Lease by failing to make their November 2018 rent payment.[21] As a result, on November 19, 2018, Toucan initiated an eviction action against the Terrys in Texas state court.[22]

4. On November 29, 2018, prior to the eviction hearing, the Debtor filed his voluntary petition for relief under chapter 13 of the Bankruptcy Code, thereby initiating this case and causing the eviction action to be stayed pursuant to the Bankruptcy Code's automatic stay provisions.[23]

**B. *The Post-Petition Default and Agreed Lift Stay Order***

5. On January 14, 2019, following the Terrys failure to make their December 2018 and January 2019 rent payments,[24] Toucan filed a motion to request termination of the automatic stay so that it could resume its efforts to evict the Terrys and retake possession of the Mansfield Property.[25] While the Debtor filed a response in opposition to the motion,[26] ultimately the parties reached agreement on the terms of an agreed order in contemplation of the Terrys moving out of the property. On February 15, 2019, the Court entered the agreed order (the "**Agreed Order**").[27]

6. Pursuant to the Agreed Order, the Court ordered the automatic stay to remain in force until 5:00 p.m. on February 13, 2019, but that if the Debtor had not moved out of the

---

[20] *See* Stay Relief Motion, ¶ 5 (and Exhibit B thereto); Stay Relief Answer, ¶ 1.

[21] *See* Stay Relief Motion, ¶ 6; Stay Relief Answer, ¶ 1.

[22] *See* Stay Relief Motion, ¶ 9; Stay Relief Answer, ¶ 1.

[23] *See* 11 U.S.C. § 362(a)(1), (a)(3) and (a)(6). Additionally, a co-debtor stay was also imposed under the Bankruptcy Code with respect to the taking of certain actions against Mrs. Terry. *See id.* § 1301(a).

[24] *See* Stay Relief Motion, ¶ 6; Stay Relief Answer, ¶1.

[25] *See* Stay Relief Motion. On the same date, Toucan also filed an accompanying motion for relief from the co-debtor stay. *See* Docket No. 20 (hereafter referred to as the "**Codebtor Stay Relief Motion**").

[26] *See* Stay Relief Answer.

[27] *See* Docket No. 32 (Agreed Order). On the same date, the Court also entered a nearly identical agreed order in resolution of the Codebtor Stay Relief Motion. *See* Docket No. 33 (the "**Agreed Codebtor Order**").

Mansfield Property by such date and time, then the automatic stay would terminate as to Toucan without any further action of the Court to "allow[ ] [Toucan] to take any and all steps necessary to exercise any and all rights it may have in the rental property commonly known as 1130 Pebble Beach Dr., Mansfield, TX 76063…."[28]

C.    **The Debtor Fails to Move Out by the Deadline; Toucan Takes Action to Lock Out the Debtor and Remove the Remaining Personal Property**

7.    As of February 13, 2019, the Terrys had not yet moved out of the Mansfield Property.  Consequently, two days later, on February 15, 2019, Toucan filed a *Notice of Termination of Automatic Stay*[29] and Mr. Daniels, on behalf of Toucan, posted a three-day notice to vacate to the front door of the Mansfield Property.  Following the posting, the Terrys accelerated their efforts to move out of the property.

8.    Later in the day on February 15, 2019, seeing the heightened move out activity at the house, Mrs. Daniels stopped by to inquire into the status of the move.  She told Mrs. Terry that Toucan wanted to give the Terrys an "appropriate amount of time" to move out – indicating a willingness to provide up to five or six days – and asked Mrs. Terry when she thought they would be done.  According to Mrs. Daniels, Mrs. Terry responded that she believed that they could be fully moved out by the evening of Sunday, February 17, 2019.

9.    Between Friday, February 15, 2019 and Sunday, February 17, 2019, the Debtor, with the assistance of his son and a friend, moved the majority of the Terrys' personal property out of the house.[30]  By the end of the evening of February 17th, however, numerous boxes and

---

[28] *See* Agreed Order, at pp.1-2 (¶¶ 1-2); *see also* Agreed Codebtor Order, at pp. 1-2 (¶¶ 1-2) (similarly providing for relief from the automatic stay).

[29] Docket No. 35.

[30] *See, e.g.*, Exhibit 8 (pictures of areas of the house where the move out was complete).

items of personal property remained.  Thus, the Terrys planned to resume their move out efforts the following day, within the noticed three-day period to vacate.

10.     On Monday, February 18, 2019, a little before 12:00 noon, Mrs. Terry arrived at the Mansfield Property to box up additional items and add a load to her car.  Because she would be headed to work thereafter, she brought along with her a change of clothes and an extra purse/bag containing various personal supplies and a small silver makeup bag.[31]  Before starting the process of packing and loading, Mrs. Terry placed her diamond engagement ring in the small silver makeup bag to avoid losing or damaging it.

11.     Once Mrs. Terry had loaded her car and readied herself for work, not wanting to show up at work with two purses/bags in hand, Mrs. Terry placed the extra purse/bag with the enclosed silver makeup bag on top of a packed box of china in the living room, intending for it to be picked up by her husband when he arrived later in the day to continue the move out process. Before leaving the house, Mrs. Terry ensured that the house was locked up and secure.

12.     Later in the day, the Debtor resumed the move out process.  At approximately 6:00 p.m. that evening, the Daniels arrived at the house.  The Debtor was not there at the time.  Upon their arrival, the Daniels found the garage door open, the windows propped open by about ten inches, and the exterior door to the master bedroom cracked open.  Consequently, based upon their concern about the property being open, they decided to enter the house to inspect it.  Upon entry, Mrs. Daniels testified that they found scattered debris, dirt and leaves throughout the property. With respect to the status of the Terrys' move out, Mrs. Daniels testified that they found only a few miscellaneous items in the kitchen, such as Tupperware lids without the proper matching storage containers, and a few beaten up boxes of no visible value, describing them as the type of

---

[31] *See* Exhibit H (listing of personal supplies).

boxes one might find at a garage sale or "on the side of the road." Additionally, Mrs. Daniels testified that each of the rooms had been labeled "empty" with a blue post-it note.[32] Thus, based upon the existence of what Mrs. Daniels characterized as just a "little bit of stuff" of the kind "that people would leave behind," the Daniels changed the locks to the property with the intention of dealing with the residual leftover property the next day.

13. Contrary to Mrs. Daniels' characterization, however, the equivalent of a full garage of packed boxes and miscellaneous items of furniture and other personal property remained in the house.[33] While much of the remaining items were located in the attic, there was, among other things, a sufficient number of unpacked items in the kitchen and boxes in the living room to have alerted the Daniels to the fact that the Terrys had not yet fully moved out.

14. Moreover, at approximately 6:30 p.m., before the Daniels had left the house, the Debtor arrived to pick up another load of the property that remained at the house. At that time, the Daniels, on behalf of Toucan, informed the Debtor that the locks to the house had been changed and that the Debtor would not be allowed to re-enter the property. When the Debtor explained that there was still property in the house that needed to be moved, the Daniels told him that he could come back to the house on either Tuesday, February 19, 2019, between the hours of 4:00 p.m. to 6:00 p.m., or Thursday, February 21, 2019, between the hours of 4:00 p.m. to 6:00 p.m. The Debtor indicated that he had work on both of those days and times but would attempt to return during the Thursday, February 21st time slot.

15. Prior to such time, however, on February 19, 2019, Mrs. Daniels, on behalf of Toucan, rented a 10 x 30 x 8 storage unit at a CubeSmart storage facility located in Mansfield,

---

[32] *See* Exhibit 8 (pictures of certain of the rooms with the "empty" note).

[33] *See* Exhibit J, at pp.1-2 (pictures of personal property that had been removed by Toucan and thereafter eventually returned to the Terrys).

Texas (the "**Storage Unit**") and Toucan began moving the remaining property (collectively, the "**Seized Property**") to the Storage Unit. On Wednesday, February 20, 2019, Toucan completed the process. The Storage Unit was locked and located within a gated facility that required a gate code to obtain access.

16. At no time prior to the removal and storage of the Seized Property had an order for eviction or an order providing for or permitting the removal of any of the Seized Property been issued by any court or any law enforcement agency. And at no time prior to the removal and storage of the Seized Property had the Terrys provided permission to Toucan, the Daniels, or anyone else on behalf of Toucan to take possession of, or move, any of the Seized Property.

17. Toucan asserts that it took the action that it took in accordance with the terms of Section 16.C.(1) of the Lease, which provides: "If Tenant leaves any personal property in the Property after **surrendering** or **abandoning** the Property Landlord may: … (c) store … such personal property by following procedures in §54.045(b)-(e), Property Code."[34] For purposes of this provision, "**surrender**" is defined in the Lease as "when all occupants have vacated the Property, in Landlord's reasonable judgment, and one of the following events occurs: (a) the date Tenant specifies as the move-out or termination date in a written notice to Landlord has passed; or (b) Tenant returns keys and access devices that Landlord provided to Tenant under this lease."[35] "**Abandonment**" is deemed to have "occur[ed] when all of the following occur: (a) all occupants have vacated the Property, in Landlord's reasonable judgment; (b) Tenant is in breach of this lease by not timely paying rent; and (c) Landlord has delivered written notice to Tenant, by affixing it to the inside of the main entry door or if the Landlord is prevented from entering the Property by

---

[34] *See* Exhibit 11 (Lease), ¶ 16.C.(1)(c) (emphasis added).
[35] *Id.*, ¶ 16.B.(2).

affixing it to the outside of the main entry door, stating that Landlord considers the Property abandoned, and Tenant fails to respond to the affixed notice by the time required in the notice, which will not be less than 2 days from the date the notice is affixed to the main entry door."[36]

18.      At no point prior to Toucan's removal and storage of the Seized Property did the Terrys provide written notice of move-out or termination of the Lease to Toucan and at no point did the Terrys return their keys, garage door openers or any other access devices to Toucan. Additionally, given the Debtor's stated intention to return to the Mansfield Property on February 21st to complete the move out process, it was not reasonable for Toucan to have believed that the Terrys had fully "vacated" the property.  Thus, at no point prior to Toucan's removal and storage of the Seized Property had the Terrys "surrendered" the Mansfield Property for purposes of Section 16.C.(1) of the Lease.

19.      With respect to abandonment, no evidence was presented of Toucan's posting of written notice to the main entry door of the Mansfield Property stating that Toucan considered the Mansfield Property to be abandoned.[37]  Even if it had, though, the Terrys made it clear to Toucan on both February 15, 2019, after Toucan had provided the three-day notice to vacate, and again on February 18, 2019, after the Daniels had changed the locks to the property, that the Terrys were in need of continuing access to the property to remove their personal property.  Indeed, Toucan evidenced its understanding of the same in offering the Debtor the short windows of time on February 19 and 21, 2019 to pick up the remaining property.  Thus, at no point prior to Toucan's

---

[36] Exhibit 11 (Lease), ¶ 16.B.(3).

[37] While testimony was provided with respect to Toucan's provision of a three-day notice to vacate, the notice itself was not introduced into evidence and no evidence was introduced to establish that the three-day notice included language stating that Toucan considered the Mansfield Property to have been abandoned.  In argument, counsel for Toucan simply stated that the three-day notice was the standard, typical three-day notice required by Texas law.  Thus, the Court concludes that the three-day notice provided by Toucan was simply the three-day notice to vacate that must be provided by a landlord in advance of the initiation of an eviction action.  *See* Tex. Prop. Code § 24.005.  Such a notice is not required to reference abandonment and, consequently, the Court concludes that the three-day notice provided by Toucan in this case did not include any reference to abandonment.

removal and storage of the Seized Property had the Terrys "abandoned" the Mansfield Property for purposes of Section 16.C.(1) of the Lease.

**D.** **The Debtor's Demand for Turnover and Eventual Recovery of Most, But Not All, of the Seized Property**

20. Following the removal and storage of the Seized Property, Toucan did not provide any form of notice to the Terrys about where the property had been moved to or how they could recover the property. Consequently, on February 25, 2019, the Debtor filed the Sanctions Motion and Turnover Motion.

21. Not until three weeks later was any genuine effort made by Toucan to address the matter. On March 19, 2019, after first attempting to call Debtor's counsel, Mrs. Daniels initiated an email exchange with Debtor's counsel.[38] Believing that Toucan was still represented by counsel, Debtor's counsel did not return Mrs. Daniel's call, and upon receipt of Mrs. Daniel's email, initially responded to that he could only communicate with counsel. Following Mrs. Daniels' representation that Toucan was no longer represented by counsel,[39] however, and seeing that Toucan's counsel had filed a motion to withdraw,[40] Debtor's counsel determined that it was permissible to engage in such communications. It was during this email exchange that Mrs. Daniels first disclosed the location of the Storage Unit and, on behalf of Toucan, purported to offer to make the keys to the Storage Unit available to the Terrys.[41] Debtor's counsel jumped at the offer and immediately attempted to coordinate on a date and time for the Debtor to pick up the keys.[42]

---

[38] *See* Exhibit K.

[39] *See id.*, at pp.3-4.

[40] On March 15, 2019, Toucan's then-counsel filed a motion to withdraw. *See* Docket No. 48. On May 10, 2019, the motion was denied for want of prosecution. *See* Docket No. 74.

[41] *See* Exhibit K, at p.3.

[42] *See id.*, at p.2.

22. The next day, on March 20, 2019, however, Mrs. Daniels back-peddled, advising that the offer to provide access was expressly conditioned on the Debtor first withdrawing the Sanctions Motion by no later than March 21, 2019, and that after the Sanctions Motion had been withdrawn access to the Storage Unit would only be made available until 6:00 p.m. on March 22, 2019.[43] Because of the unreasonableness of both the condition of withdrawal and the limited time of access, the Debtor rejected Toucan's offer.[44]

23. Ultimately, Toucan eventually relented and agreed to release the Seized Property to the Terrys. On March 23, 2019, over a month after the seizure, Toucan arranged for a moving company to deliver the Seized Property to the Terrys' new residence. As explained further below, certain of the Seized Property was not returned. With respect to this missing property, Mrs. Daniels testified that none of it remains within the possession, custody or control of Toucan.

**E.**     ***Toucan's Exercise of Control Over the Seized Estate Property Violated the Automatic Stay and Caused Damage to the Debtor***

24. At no point in time did Toucan request or obtain relief from the automatic stay to seize any of the Debtor's personal property or withhold possession of any such property from the Debtor. Toucan did not disclose the location of the Seized Property until March 19, 2019, and even then refused to provide access to the Storage Unit where the property was kept in the absence of the Debtor's withdrawal of the Sanctions Motion. Not until March 23, 2019, did Toucan arrange for any of the Seized Property to be returned to the Debtor.

25. Toucan's actions in obtaining possession of, and exercising control over, those items of Seized Property *constituting property of the Debtor's estate* violated the automatic stay

---

[43] *See id*., at pp.1-2.

[44] *See id*., at p.1.

of the Bankruptcy Code.[45] Such actions were willfully and intentionally undertaken by Toucan with full knowledge of the existence of the automatic stay, thereby entitling the Debtor to recover damages.[46]

26. As emphasized in the preceding paragraph, Toucan's violation of the automatic stay only occurred in relation to the Seized Property *constituting property of the Debtor's estate* (collectively, the "**Seized Estate Property**"). To the extent that the Seized Property was *not* property of the Debtor's estate, Toucan's actions did not violate the stay and, correspondingly, the damages recoverable by the Debtor for violation of the stay are limited to those incurred with respect to only the Seized Estate Property.[47]

### (1) *Determination of Missing Estate Property and Damaged Estate Property*

27. Exhibit H, prepared by the Terrys, is an itemization of the Seized Property never turned over to the Terrys. The Debtor explained that in preparing Exhibit H, they did not have a pre-existing itemization of personal property from which to work; instead they prepared the itemization based upon memory. Exhibit I, also prepared by the Terrys, is an itemization of Seized Property allegedly returned to the Terrys in a damaged state. The Debtor explained that Exhibit I was prepared based upon a review of the condition of the Seized Property returned by Toucan.

28. Importantly, with respect to both listings, any item of property that constituted either (a) the separate property of Mrs. Terry or anyone other than the Debtor or (b) the community

---

[45] *See* 11 U.S.C. § 362(a)(3) (stay of any act to obtain possession of property of the estate or to exercise control over property of the estate).

[46] *See id.* § 362(k).

[47] This is not to suggest that Toucan's actions in relation to seized *non-estate* property are immune from attack. Toucan may indeed be liable for its actions on grounds other than for violation of the automatic stay. In this regard, the Debtor appears to argue in his post-trial briefing that Toucan should be held liable for violating various provisions of the Texas Property Code. *See* Docket No. 66, at pp. 9-16. Because the dispute tried to the Court was limited to Toucan's alleged violation of the automatic stay, however, the Court declines to consider any alternative theories of liability as part of this proceeding.

property of the Terrys that was both (i) under the sole management and control of Mrs. Terry and (ii) not liable for any allowable claim against the Debtor, individually, or the Terrys, collectively, must be excluded from consideration as to damages because such property did not constitute property of the Debtor's estate.[48] With this in mind, to ascertain the nature of the property listed on Exhibits H and I, the Court has considered not only the content of the exhibits, themselves, but also the testimony of Mrs. Terry and information previously supplied by the Debtor under oath in Schedules A/B[49] and D.[50]

29.    With respect to the exhibits themselves, Exhibit H includes, for example, an entry for various articles of clothing belonging to the Terrys' granddaughter.[51] While unfortunate that such items have gone missing, they must be excluded from any damages consideration based upon their nature as non-estate property.

30.    In the case of testimony, Mrs. Terry described certain items of separate property and sole management and control property in discussing the move out efforts that she undertook on February 18, 2019 (*e.g.,* diamond engagement ring (separate property) and extra bag/purse, makeup bag, silver hoop earrings, pack of contacts, and personal supplies to get ready for work (sole management and control property because they are items that Mrs. Terry would have owned if single)). None of these items are identified by the Debtor on Schedule D as collateral for any allowable claim in the bankruptcy case. Thus, such items of property must also be excluded from damages consideration based upon their nature as non-estate property.

---

[48] *See* below discussion regarding community property, Conclusions of Law, § A(1).
[49] *See* Docket No. 37, at pp. 2-3 and 8 (amended Schedule A/B: Property).
[50] *See* Docket No. 11, at pp.13-14 (Schedule D: Creditors Who Have Claims Secured by Property).
[51] *See* Exhibit H, at p. 2 (listing for *granddaughter's* clothes, pajamas, kitty jacket, socks, panties and tops).

31.     Finally, to the extent that any other property listed on the exhibits was not also listed or encompassed within a category of property listed by the Debtor on Schedule A/B, then it is properly excludable from damages consideration.  Based upon Schedule A/B, such property either constitutes non-estate property or is no longer owned by the Debtor.  Alternatively, the property is of such inconsequential value that it was not listed.  Appendix A sets out the Debtor's relevant disclosures from Schedule A/B of his ownership in items of personal property and categories of personal property as of the date of his bankruptcy filing (along with the Debtor's estimate of the fair market value of such property as of such date).

32.     Based upon the foregoing sources of information, Appendix B identifies which of the items of Seized Property listed on Exhibits H and I constituted Seized Estate Property as of the date on which Toucan took possession of the Seized Property (the unreturned items of Seized Estate Property collectively referred to herein as the "**Missing Estate Property**" and the Seized Estate Property allegedly returned in a damaged state collectively referred to herein as the "**Damaged Estate Property**").

*(2)     Compensatory Damages*

*(a) Missing Estate Property and Damaged Estate Property*

33.     Turning to damages, the Debtor testified that he conducted on-line research to determine the estimated replacement cost of each item of Missing Estate Property and Damaged Estate Property other than certain items of property that are irreplaceable due to their unique character (*e.g.*, yearbooks) and/or sentimental value (*e.g.*, picture sewn by grandmother).  Such replacement cost figures are set out in Exhibits H and I.  The Debtor did not otherwise present any evidence of the fair market value of any of the Missing Estate Property or Damaged Estate Property.  Consequently, the Court has also considered the fair market values set out in the

Debtor's filed Schedule A/B in order to extrapolate reasonable fair market value estimates for the property at issue. Appendix C reflects a comparison of the replacement cost figures supplied by the Debtor in Exhibits H and I to the fair market value figures supplied by the Debtor in Schedule A/B.

34. With the foregoing in mind, each of the items of Missing Estate Property falls within the Debtor's Schedule A/B category of household goods and furnishings. As evidenced by Appendix C, the Debtor's total estimated replacement cost of all Missing Estate Property and Damaged Estate Property within the household goods and furnishings category of property nearly equates the total fair market value assigned by the Debtor in Schedule A/B to *all* household goods and furnishings. The description of household goods and furnishings included in Schedule A/B, however, includes numerous items of property that are not among the items of Missing Estate Property and Damaged Estate Property listed on Exhibits H and I. Such additional items include, without limitation, a washer/dryer, kitchen table with chairs, dining room table with chairs, recliner, love seat, couch, coffee table, 3 beds, 2 dressers, 3 nightstands, and a chest of drawers.[52] Thus, it is readily apparent that the aggregate replacement cost amount assigned by the Debtor to the Missing Estate Property substantially exceeds the fair market value assigned by the Debtor to such property.

35. Thus, based upon the fair market value assigned by the Debtor to all household goods and furnishings in Schedule A/B and the nature of those items of scheduled household goods and furnishings that are not among the Missing Estate Property and Damaged Estate Property, the Court finds the fair market value of the Missing Estate Property to be roughly one-third of the aggregate replacement cost assigned by the Debtor to such property. Accordingly, the Court finds

---

[52] *See* Docket No. 37, at pp. 2-3 and 8 (Schedule A/B property); Appendix A.

the fair market value of the Missing Estate Property, and thus the amount of damages to be awarded to the Debtor on account of the same, to be $516.67.[53]

36.     Focusing next on the Damaged Estate Property, the evidence was murky, at best, with respect to which items of property were truly damaged and to what extent. For example, the Debtor testified that many of the items of property had been returned in a dirty or "nasty" state, having apparently been exposed to a dirty environment and, in some instances, possibly rain in the course of the moves and/or while in storage.[54] While it was no doubt annoying to receive the property back in a dirty condition, the Debtor failed to present evidence of the extent of any actual damage caused to the property by its uncleanliness or the cost of any necessary cleaning.

37.     Additionally, on an overall basis, the Debtor provided only the estimated replacement cost of each item of Damaged Estate Property, thereby effectively treating all such items of property as if they were damaged beyond repair. But based upon the evidence presented, very little of the Damaged Estate Property was truly damaged beyond repair. By way of example, while the Grinch backing to the Debtor's Christmas wreath had been separated from the wreath,[55] the backing was clearly capable of being reattached to the wreath. Similarly, while the picture sewn by the Debtor's grandmother had been separated from its frame,[56] clearly the picture was capable of being reframed. And while the backing to certain of the Debtor's office furniture had apparently been scratched or scraped,[57] the backing was clearly capable of being repaired or replaced without having to replace the entire piece of furniture. In each of these instances, the property was not damaged beyond repair. Yet the Debtor presented no evidence of the cost of

---

[53] $1,550 (total replacement cost assigned to items of Missing Estate Property) / 3 = $516.67 (rounded).
[54] *See, e.g.*, Exhibit J, at pp. 5, 17, 19, 24-28, 31-35.
[55] *See id.*, at p. 13.
[56] *See id.*, at p. 16.
[57] *See id.*, at 18.

repair, or a difference in the property's fair market value before and after the damage, instead treating the property as a total loss. However, the award of replacement cost damages would improperly over-compensate the Debtor for the total loss of such property where there has not been a total loss.

38.     Thus, based upon the pictorial evidence submitted, it appears that the items of Damaged Estate Property truly and clearly damaged beyond repair consist of certain steins,[58] a broom,[59] and the Christmas centerpiece Santa with reindeer.[60] The Debtor provided no evidence of the fair market value of the steins. Thus, the Court has no basis on which to award damages for such items. With respect to the other two items, because they fall within the category of household goods and furnishings in Schedule A/B, the Court has applied the same methodology as applied to the Missing Estate Property in determining that the fair market value of such property, and hence the amount of damages to be awarded to the Debtor on account of the damage to such property, to be $56.67.[61]

39.     As to all other items of Damaged Estate Property, the Debtor has failed to establish by a preponderance of the evidence any basis for the recovery of damages and/or the amount of the damages incurred. Specifically, the Debtor has failed to substantiate that any of the additional items were truly damaged beyond repair and has otherwise wholly failed to present any evidence of the estimated cost of repairing and/or cleaning, as applicable, such items, or of the change in the fair market value of such items as a result of the damage. Therefore, no damages will be awarded with respect to the remaining items of Damaged Estate Property.

---

[58] *See* Exhibit J, at pp. 5 and 22.

[59] *See id.*, at p. 12.

[60] *See id.* at p. 21.

[61] $170 (total replacement cost assigned to such items of Damaged Estate Property) / 3 = $56.67 (rounded).

### (b) Attorneys' Fees and Expenses

40.     The Debtor also seeks the recovery of attorneys' fees and expenses incurred in having the law firm of Machi & Associates, P.C. (the "**Machi Firm**") represent him in connection with preparing and prosecuting the motions. The Debtor has submitted the Wright Declaration in support of the fees and expenses requested.

41.     In the Wright Declaration, Daniel Wright ("**Wright**"), lead attorney for the Debtor, explains that the Machi Firm utilized one attorney (Wright) at a rate of $300 per hour along with paralegal assistance at a rate of $80 per hour. Such rates are reasonable and customary within this District for the type of services performed by the Machi Firm.

42.     Wright further explains that he expended a total of 20.6 hours, and that his paralegals expended a total of 7.0 hours, in rendering services on behalf of the Debtor, resulting in total fees of $6,740.00. Because the paralegal time was recorded in quarter of an hour increments instead of tenth of an hour increments, however, the Court finds that the time expended by the paralegals must be adjusted. Based upon a review of the time descriptions included in the attachment to the Wright Declaration, the Court finds that an appropriate reduction to the amount of time expended by the paralegals is 0.4 hours, resulting in a reduction of the fees by $32.00. This reduces total attorneys' fees to $6,708.00, equating to a blended hourly rate of approximately $246.62 for the team.

43.     Given the nature of these matters, the issues in dispute between the parties, the content of the motions, post-trial briefing and other filings prepared on behalf of the Debtor in connection with these proceedings, and the compilation of the exhibits introduced into evidence on behalf of the Debtor, the Machi Firm's expenditure of 27.2 hours in representing the Debtor is reasonable and was necessary. Based upon the same considerations and the results obtained by

the Machi Firm on behalf of the Debtor in prosecuting the motions (including, without limitation, the Debtor's recovery of most of the Seized Estate Property), an award of $6,708.00 in attorneys' fees is reasonable.

44. Toucan argues that an award of attorneys' fees in excess of $6,000.00 would be improper as disproportionate to the value of the property lost or damaged. Toucan argues that any award of attorneys' fees should be "closer to a few hundred dollars."[62] Toucan's analysis, however, is improperly myopic in perspective. The property at issue in this dispute is not limited to the Missing Estate Property and Damaged Estate Property for which damages are awardable. Instead, the property at issue includes *all* of the Seized Estate Property that Toucan improperly seized and was unwilling to release to the Debtor until nearly a month after the Sanctions Motion and Turnover Motion had been filed. Only on the very eve of the hearing on the motions did Toucan finally agree to release any of the property. Thus, put in proper perspective, the above award of attorneys' fees is not disproportionate to the property and amounts at issue.

45. Separately, Wright has also provided uncontested evidence of the Machi Firm's incurrence of $134.85 in actual and necessary expenses in connection with the engagement.

46. Based upon the foregoing, additional damages in the aggregate amount of $6,842.85 for the reasonable and necessary attorneys' fees and expenses incurred by the Debtor will be awarded.

### (3) *Punitive Damages*

47. Toucan's conduct in taking possession of and moving the Seized Estate Property, and in thereafter withholding the Seized Estate Property from the Debtor for over a month, was unquestionably egregious.

---

[62] *See* Docket No. 73, at p. 14 (¶ 29).

48.     Before seizing and removing the Seized Estate Property from the Mansfield Property, Toucan was made aware of the Debtor's intention to pick up and move these remaining items of property to his new residence. Indeed, in response to the Debtor's stated intention, Toucan offered to provide access to the house on February 21, 2019 for the purpose of enabling the Debtor to remove the remaining property. Prior to such date, however, Toucan reneged on the promise, instead moving all of the Seized Estate Property to an undisclosed storage facility that was inaccessible to the public without a gate code and key.

49.     Then, after failing to provide the Debtor with information of the new location of the Seized Estate Property and how the Debtor could retrieve such property, and in the face of the Sanctions Motion and Turnover Motion, Toucan decided to sit on the matter for nearly a month. Only on the eve of the hearing on the Sanctions Motion and Turnover Motion did Toucan finally deem it necessary to engage in addressing the matter. Yet, even at this juncture, Toucan refused to provide the Debtor with access to the Seized Estate Property in the absence of the Debtor's withdrawal of the Sanctions Motion. Not until over a month after taking possession of the Seized Estate Property did Toucan release any of the property to the Debtor – failing to return multiple items of the property and returning several items of the property in a damaged condition. Such conduct on the part of Toucan is egregious and shocking, warranting an assessment of punitive damages.

50.     Given the high degree of reprehensibility of Toucan's conduct, the amount of the actual compensable damages incurred by the Debtor, as outlined above, and the level of penalties imposed in comparable cases,[63] an award of punitive damages in the amount of $7,500 is warranted and necessary to cause a change in behavior and have a deterrent effect.

---

[63] *See* footnote 96, *infra*.

## CONCLUSIONS OF LAW

### A. Violation of the Automatic Stay

Pursuant to the Sanctions Motion, the Debtor asserts that Toucan violated the automatic stay of the Bankruptcy Code in taking possession of and moving the Seized Property, and in thereafter withholding the Seized Property from the Debtor. The Debtor requests relief in the form of an award of compensatory damages, including attorneys' fees and costs, and punitive damages. Toucan, on the other hand, asserts that there was no stay violation because the stay had already been lifted under the terms of the Agreed Order, thereby entitling it to take action under the terms of the Lease and/or Texas law, or alternatively that there is no basis for an award of damages because Toucan did not willfully violate the stay for purposes of section 362(k) of the Bankruptcy Code. For the reasons set out below, Toucan is incorrect.

Upon the commencement of a chapter 13 bankruptcy case the automatic stay of section 362(a) of the Bankruptcy Code – a statutory injunction designed to protect the chapter 13 debtor and the debtor's estate – is immediately imposed.[64] The automatic stay is perhaps the single most important and fundamental protection provided to an individual debtor in bankruptcy. Among other things, section 362(a)(3) of the Bankruptcy Code provides that the filing of a petition for relief under the Bankruptcy Code "operates as a stay, applicable to all entities, of … any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[65] In each case, the focus is on "property of the estate." Therefore, it is first necessary to determine whether and to what extent the Seized Property constituted property of the estate.

---

[64] *See* 11 U.S.C. § 362(a).
[65] *Id*. § 362(a)(3).

### *(1) The Stay Protected Only the Seized Estate Property*

Pursuant to section 541 of the Bankruptcy Code, the estate of a debtor includes not only all of the legal and equitable interests of the debtor in property as of the commencement of the bankruptcy case,[66] but also "[a]ll interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is – (A) under the sole, equal, or joint management and control of the debtor; or (B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable."[67] Focusing on the community property aspects of the provision, "[t]he term 'community property' is not defined in the Code, but clearly is used as a term of art referring to that certain means of holding marital property in those states which have adopted a community property system."[68] In a chapter 13 case, the estate also includes property of the kind specified in section 541 of the Bankruptcy Code that the debtor acquires after the commencement of the case, but before the case is closed, dismissed or converted to a proceeding under another chapter of the Bankruptcy Code, whichever occurs first.[69]

Based upon the foregoing, and inasmuch as Texas is a community property state, the bankruptcy estate of the Debtor as of the date on which Toucan took possession of the Seized Property included not only all of the legal and equitable interests of the Debtor in property as of such date, but also all of the community property of the Terrys as of such date that was either under the sole, equal or joint management and control of the Debtor or liable for an allowable claim against the Debtor or against both of the Terrys, to the extent that such interest was so liable. Under

---

[66] 11 U.S.C. § 541(a)(1).

[67] *Id.* § 541(a)(2).

[68] *Anderson v. Conine (In re Robertson)*, 203 F.3d 855, 859 (5th Cir. 2000) (quoting 5 Collier on Bankruptcy ¶ 541.13[1], at 541-76 n.1 (15th ed. 1999)).

[69] 11 U.S.C § 1306(a)(1).

Texas law, "community property" consists of "the property, other than separate property, acquired by either spouse during marriage."[70] Thus, inversely, any item of Seized Property that either (a) constituted the separate property of Mrs. Terry or anyone other than the Debtor or (b) constituted the community property of the Terrys that was both (i) under the sole management and control of Mrs. Terry and (ii) not liable for any allowable claim against the Debtor, individually, or the Terrys, collectively, was not property of the Debtor's estate as of the date on which Toucan took possession of the Seized Property.

In evaluating the above exclusions, under Texas law, a spouse's separate property consists of (1) the property owned or claimed by the spouse before marriage, (2) the property acquired by the spouse during marriage by gift, devise or descent, and (3) the recovery of personal injuries sustained by the spouse during marriage, except any recovery for loss of earning capacity during marriage.[71] Texas law further provides that community property considered to be under the sole management and control of a spouse is that "community property that the spouse would have owned if single, including [among other things] the increase and mutations of … all property subject to the spouse's sole management, control, and disposition."[72] Thus, applying the foregoing principles to the items of Seized Property listed by the Terrys in Exhibits H and I, only the Missing Estate Property and Damaged Estate Property constituted property of the Debtor's estate as of the date on which Toucan took possession of the Seized Property.

---

[70] Texas Fam. Code § 3.002*; see also In re Trammell*, 399 B.R. 177, 182 (Bankr. N.D. Tex. 2007).

[71] Texas Fam. Code § 3.001.

[72] *Id.* § 3.102; *see also Montemayor v. Ortiz*, 208 S.W.3d 627, 643-45 (Tex. App. – Corpus Christi 2006, pet. denied).

(2)     *Toucan's Possession and Withholding of the Seized Estate Property*
        *Was Not Permitted By the Agreed Order and Violated the Automatic Stay*

Turning now to the merits of the asserted stay violation, it is clear that Toucan both exercised possession of and control over the Seized Estate Property – actions which run afoul of the stay provisions of section 362(a)(3) of the Bankruptcy Code. Thus, the sole question is whether such actions were permitted under the terms of the Agreed Order, as asserted by Toucan.

The Agreed Order provided that if the Debtor failed to move out of the Mansfield Property by 5:00 p.m. on February 13, 2019, then the automatic stay would terminate as to Toucan without any further action of the Court to "allow[ ] [Toucan] to take any and all steps necessary to exercise any and all rights it may have in the rental property commonly known as 1130 Pebble Beach Dr., Mansfield, TX 76063…."[73] Here, it is undisputed that the Debtor failed to move out by above-referenced deadline. Therefore, as of 5:01 p.m. on February 13, 2019, the stay on longer prevented Toucan from exercising any and all of its rights that it had in "the rental property commonly known as 1130 Pebble Beach Dr., Mansfield, TX 76063." Noticeably absent from the Agreed Order, however, is any language with respect to any of the Seized Estate Property. Thus, the only way that Toucan's actions may be immunized by the Agreed Order is if the actions were taken by Toucan in exercising its rights in the Mansfield Property. With respect to this angle of the argument, Toucan asserts that its actions were both authorized by the Lease and pursuant to Texas Property Code § 93.002.

First, Toucan asserts that its actions were authorized under Section 16.C.(1) of the Lease, which provides: "If Tenant leaves any personal property in the Property after surrendering or abandoning the Property Landlord may: … (c) store … such personal property by following

---

[73] *See* Agreed Order, at pp.1-2 (¶¶ 1-2).

procedures in §54.045(b)-(e), Property Code."[74]  For the reasons set out above, however, the Debtor neither "surrendered" nor "abandoned" the Mansfield Property under the terms of the Lease.[75]  Second, with respect to Toucan's argument under section 93.002 of the Texas Property Code, such provision is inapplicable because it only applies to landlords and tenants of commercial rental property.[76]  Here, the leasehold relationship involved residential rental property.[77]  As a result, Toucan has failed to advance any viable argument that would shield its actions under the terms of the Agreed Order.

### (3) *Damages Under Section 362(k) of the Bankruptcy Code*

Turning to remedies, the Debtor requests an award of both compensatory and punitive damages under section 362(k) of the Bankruptcy Code.  Section 362(k) provides in relevant part that "an individual injured by any willful violation of [the automatic stay] shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."[78]  In order to satisfy the willfulness standard of section 362(k) for the recovery of damages thereunder, the individual claiming injury must establish the following three elements: (1) the violator knew of the existence of the automatic stay; (2) the violator's acts were intentional; and (3) the acts violated the stay.[79]  As to the second element, it is unnecessary to prove that the violator intended to violate the stay itself; instead, the statute only requires that the violator

---

[74] *See* Exhibit 11 (Lease), ¶ 16.C.(1)(c).

[75] Moreover, the storage contemplated by the Lease is in conjunction with the sale of personal property in accordance with the procedures of section 54.045 of the Texas Property Code.  *See* Tex. Prop. Code § 54.045(b)-(e).  And clearly the sale of Seized Estate Property is not authorized by the Agreed Order and would violate other provisions of the automatic stay.  *See, e.g.,* 11 U.S.C. § 362(a)(4) (stay against enforcing any lien against property of the estate).

[76] *See* Tex. Prop. Code § 93.001 (provisions of chapter 93 only applicable to landlords and tenants of commercial rental property).

[77] *See id.* § 92.002 (provisions of chapter 92 applicable to landlords and tenants of residential rental property).

[78] 11 U.S.C. § 362(k)(1).

[79] *See Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298, 302 (5th Cir. 2005); *see also Young v. Repine (In re Repine)*, 536 F.3d 512, 519 (5th Cir. 2008), *cert. denied*, 555 U.S. 1138 (2009).

intended to take the actions that violated the stay.[80] The individual seeking relief under section 362(k) has the burden of proving each of these three elements by a preponderance of the evidence.[81]

The Debtor has satisfied each of these three elements. First, Toucan was clearly aware of the existence of the automatic stay at the time of taking possession of the Seized Estate Property and withholding it from the Debtor. Indeed, the events leading up to this dispute started with Toucan's request for relief from the automatic stay, which resulted in entry of the Agreed Order. Plus, following Toucan's seizure of the Seized Estate Property, Toucan was put on further, unmistakable notice of the automatic stay when the Debtor filed the Sanctions Motion. Importantly, the fact that Toucan was purportedly under the misguided belief that the stay did not apply to the Seized Estate Property on account of the Agreed Order is of no moment. The question is not whether Toucan had the subjective belief of the applicability of the automatic stay to its actions related to the Seized Estate Property, but rather whether Toucan was aware of the existence of the automatic stay.[82] Second, there is similarly no question about Toucan's intentional conduct in seizing the Seized Estate Property and withholding it from the Debtor. The evidence is clear that, despite Toucan's offer to provide the Debtor access to the Mansfield Property on February 21, 2019 for the purpose of picking up all remaining items of personal property, Toucan consciously decided to, instead, take possession of the Seized Estate Property prior to such date, move it to the Storage Unit, and then withhold it from the Debtor for nearly a month after the filing

---

[80] *See Chesnut*, 422 F.3d at 302 (quoting *Tsafaroff v. Taylor (In re Taylor)*, 884 F.2d 478, 482 (9th Cir. 1989)); *Collier v. Hill (In re Collier)*, 410 B.R. 464, 472 (Bankr. E.D. Tex. 2009).

[81] *Collier*, 410 B.R. at 472.

[82] *See Chesnut*, 422 F.3d at 302 ("Whether the [defendant] believes in good faith that it had a right to [act in contravention of the automatic stay] is not relevant to whether the act was 'willful' or whether compensation must be awarded") (quoting *Taylor*, 884 F.2d at 482); *In re Webb*, 472 B.R. 665, at *15 (6th Cir. B.A.P. 2012) ("A creditor's good faith belief that its intentional actions did not violate the automatic stay is not a defense to a § 362(k) action"); *Collier*, 410 B.R. at 472.

of the Sanctions Motion – at one point even refusing to release the property in the absence of the Debtor first withdrawing the Sanctions Motion. Finally, for the reasons already discussed, Toucan's actions in taking possession of and moving the Seized Estate Property, and in thereafter withholding the Seized Estate Property from the Debtor, violated the automatic stay provisions of section 362(a)(3) of the Bankruptcy Code. Therefore, the Debtor has successfully established that Toucan willfully violated the automatic stay.

Based upon the foregoing, section 362(k) of the Bankruptcy Code mandates the award of actual damages, including costs and attorneys' fees.[83] The level of damages awardable for violation of the automatic stay is the amount of economic loss the debtor has suffered as the proximate result of the violator's actions.[84] With respect to actions taken against property, an award of actual damages may include the cost of repairing any damaged property and the fair market value of any lost or completely destroyed property.[85] "While the debtor need not employ intellectually sophisticated methodologies to prove the amount of actual damages, the damages requested must be supported by concrete evidence and proven with reasonable certainty, as mere speculation, guess, or conjecture will not suffice."[86] The Debtor has the burden of proving actual damages by a preponderance of the evidence.[87]

---

[83] *See* 11 U.S.C. § 362(k)(1) ("an individual injured by any willful violation of [the automatic stay] *shall recover* actual damages, including costs and attorneys' fees") (emphasis added); *see also Garza v. CMM Enters., LLC (In re Garza)*, 605 B.R. 817, 829 (Bankr. S.D. Tex. 2019) ("Section 362(k)(1) mandates that one injured by a willful stay violation 'shall recover' actual damages, costs and attorneys' fees….The words 'shall recover' indicate that Congress intended that the award of actual damages, costs, and attorneys' fees be mandatory upon a finding of a willful violation of the stay").

[84] *See Achterberg v. Creditors Trade Ass'n, Inc.*, 573 B.R. 819, 833 (Bankr. E.D. Cal. 2017).

[85] *See In re Johnson*, 601 B.R. 365, 378 (Bankr. E.D. Pa. 2019); *Achterberg*, 573 B.R. at 833; *In re Seaton*, 462 B.R. 582, 595-96 (Bankr. E.D. Va. 2011); *cf. J&D Towing, LLC v. American Alternative Ins. Corp.*, 478 S.W.3d 649, 656 (Tex. 2016) (discussing measure of damages for partially destroyed personal property); *United Mobile Networks, L.P. v. Deaton*, 939 S.W.2d 146, 147-48 (Tex. 1997) (measure of damages for conversion is fair market value of the property at the time and place of the conversion).

[86] *Johnson*, 601 B.R. at 379; *see also Seaton*, 462 B.R. at 595-96.

[87] *Seaton*, 462 B.R. at 595.

Here, the Debtor has established that he suffered actual compensatory damages of $7,416.19.[88] In the case of attorneys' fees and costs, while section 362(k) does not expressly impose a requirement that such fees and costs be reasonable and necessary,[89] "courts have determined that such an award must be 'reasonable and necessary,' and that courts should 'closely scrutinize the fees requested by attorneys for unnecessary and excessive charges.'"[90] Accordingly, the Court closely scrutinized the fees and expenses requested by the Debtor and, for the reasons set forth above, has determined that the $6,842.85 in attorneys' fees and expenses included in the above amount were actually and necessarily incurred and are reasonable under the facts and circumstances of this case.[91]

Turning next to punitive damages, section 362(k) provides that such damages "may" be recovered by an individual injured by a willful violation of the stay "in appropriate circumstances."[92] "The availability of punitive damages in this context 'encourages would-be [stay] violators to obtain declaratory judgments before seeking to vindicate their interests in violation of an automatic stay, and thereby protects debtors' estates from incurring potentially unnecessary legal expenses in prosecuting stay violations.' Such damages are generally designed to cause a change in the creditor's behavior and serve as a deterrent to certain actions of

---

[88] Such compensatory damages are comprised of Missing Estate Property damages of $516.67 *plus* Damaged Estate Property damages of $56.67 *plus* $6,842.85 in reasonable and necessary attorneys' fees and expenses.

[89] *Compare* 11 U.S.C. § 330(a)(1) (requiring fees and expenses awardable to estate professionals to be actual, necessary and reasonable), *with* 11 U.S.C. § 362(k) (omitting reference to any standards).

[90] *See Collier*, 410 B.R. at 478 (quoting *In re Parry*, 328 B.R. 655, 659 (Bankr. E.D.N.Y. 2005)).

[91] *See also Repine*, 536 F.3d at 522 (explaining that fees incurred in prosecuting an action under § 362(k) are recoverable).

[92] 11 U.S.C. § 362(k)(1).

creditors…."[93] Accordingly, the Fifth Circuit has interpreted "appropriate circumstances" as requiring a determination of "egregious conduct" on the part of the stay violator.[94]

As explained above, Toucan's conduct in taking possession of and moving the Seized Estate Property, and in thereafter withholding the Seized Estate Property from the Debtor for over a month, was unquestionably egregious warranting an assessment of punitive damages. "In determining the amount of punitive damages to award, the Court considers (1) the degree of reprehensibility of the violator's conduct, (2) the disparity between the harm or potential harm to the complainant and the punitive damages, and (3) the difference between penalties imposed in comparable cases."[95] Thus, given the high degree of the reprehensibility of Toucan's conduct in this case, the amount of the actual compensable damages incurred by the Debtor, as outlined above, and the level of penalties imposed in comparable cases,[96] the Court finds and concludes that an award of punitive damages in the amount of $7,500 is warranted and necessary to cause a change in behavior and to have the requisite deterrent effect.

## B.    *Turnover of Missing Estate Property*

Finally, the Debtor also requests the entry of an order directing Toucan to turn over the missing Seized Property. Pursuant to section 542 of the Bankruptcy Code, subject to certain exceptions that are not applicable, "an entity, other than a custodian, in possession, custody, or

---

[93] *Collier*, 410 B.R. at 478 (citations omitted) (quoting *Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1105 (2nd Cir. 1990)).

[94] *See Repine*, 536 F.3d at 521 ("Section 362(k) allows punitive damages 'in appropriate circumstances.'….We agree that an egregious conduct standard is applicable"); *see also In re Lara*, 569 B.R. 231, 237 (Bankr. N.D. Tex. 2017); *Bruner-Halteman v. Educational Credit Mgmt. Corp. (In re Bruner-Halteman)*, Adv. No. 14-03041, 2016 WL 1427085, at *8 (Bankr. N.D. Tex. Apr. 8, 2016); *Collier*, 410 B.R. at 478.

[95] *Bruner-Halteman*, 2016 WL 1427085, at *9 (citing *BMW of N. Am. v. Gore*, 517 U.S. 559, 574-75 (1996)).

[96] *See, e.g., Wilson v. Arbors of Central Park ICG, LLC (In re Wilson)*, Adv. No. 19-04006, 2019 WL 6460491, at *9 (Bankr. N.D. Tex. Dec. 2, 2019) (awarding $10,000 in punitive damages); *Lara*, 569 B.R. at 237 (awarding $24,000 in punitive damages); *Bruner-Halteman*, 2016 WL 1427085, at *9 (awarding $74,000 in punitive damages); *Collier*, 410 B.R. at 480 (awarding $3,000 in punitive damages).

control, during the case, of property that the [debtor][97] may use, sell, or lease under section 363 of [the Bankruptcy Code], or that the debtor may exempt under section 522 of [the Bankruptcy Code], shall deliver to the [debtor], and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate."[98] The party seeking turnover bears the burden of proof under section 542.[99]

Here, Toucan asserts that it has already turned over the Seized Estate Property and that none of the Missing Estate Property remains within its possession, custody or control. The Debtor has presented no evidence to the contrary. In fact, the very basis for the recovery of damages for the Missing Estate Property under section 362(k) is that such property has not and will never be returned to the Debtor. Accordingly, the Debtor's request for turnover relief under section 542 will be denied.

## *CONCLUSION*

Based upon the foregoing, and in summary, the Court will separately issue (a) an order denying the Turnover Motion and (b) an order granting in part, and denying in part, the Sanctions Motion pursuant to which (i) Toucan is determined to have violated the automatic stay provisions of section 362(a)(3) of the Bankruptcy Code in taking possession of and moving the Seized Estate Property, and in thereafter withholding the Seized Estate Property from the Debtor; (ii) the Debtor is awarded compensatory damages against Toucan under section 362(k) of the Bankruptcy Code in the amount of $7,416.19; (iii) the Debtor is awarded punitive damages against Toucan under

---

[97] The text of section 542 refers to the "trustee." Pursuant to sections 1303 and 1304 of the Bankruptcy Code, however, a chapter 13 debtor is provided the rights and powers of a trustee under section 363 to use, sell or lease property of the estate. *See* 11 U.S.C. §§ 1303 and 1304(b).

[98] 11 U.S.C. § 542(a).

[99] *Yaquinto v. Greer*, 81 B.R. 870, 877 (N.D. Tex. 1988).

section 362(k) of the Bankruptcy Code in the amount of $7,500.00; and (iv) all other relief requested in the Sanctions Motion is denied.

### END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW ###

# APPENDIX A

**Debtor's Disclosure of Ownership in Relevant Items of Personal Property
Pursuant to Schedule A/B**

<u>Current Value</u>

**Household goods and furnishing** $4,724.77

*Examples*: Major appliances, furniture, linens, china, kitchenware

> **Describe: kitchenware, toaster, mixer, refrigerator, washer/dryer, kitchen table with chairs, dining room table with chairs, recliner, love seat, couch, end table, coffee table, 3 beds, 2 dressers, 3 nightstands, chest of drawers, 2 chairs, desk, storage unit, grill, lawn mower, outdoor power tools, hand tools, power tools and and misc. household furnishings, tools and equipment ($3,000.00) Refrigerator, Area Rugs ($1,724.77)**

**Electronics** $2,500.00

*Examples*: Televisions and radios; audio, video, stereo, and digital equipment; computers, printers, scanners; music collections; electronic devices including cell phones, cameras, media players, games

> **Describe: 3 TVs, 2 cellphones, DVD player, DVDs, i-pad, soundbar, desk top computer and misc. electronics**

**Collectibles of value** $500.00

*Examples*: Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; stamp, coin, or baseball card collections; other collections, memorabilia, collectibles

> **Describe: Books and pictures (primarily spouse's separate property)**

**Equipment for sports and hobbies** $0.00

*Examples*: Sports, photographic, exercise, and other hobby equipment; bicycles, pool tables, golf clubs, skis; canoes and kayaks; carpentry tools; musical instruments

> **Describe**: [no entry]

**Firearms** $400.00

*Examples*: Pistols, rifles, shotguns, ammunition, and related equipment

> **Describe: 12 gauge shotgun, 20 gauge shotgun**

**Clothes** $400.00

*Examples*: Everyday clothes, furs, leather coats, designer wear, shoes, accessories

> **Describe: everyday clothes and shoes**

**Jewelry** $1,700.00

*Examples*: Everyday jewelry, costume jewelry, engagement rings, wedding rings, Heirloom jewelry, watches, gems, gold, silver

> **Describe: rings, watch, wedding ring, misc. costume jewelry**

**Any other personal and household items you did not already list, including any health aids you did not list** $0.00

> **Give specific information: Wife's separate property – Frost Bite Cupcakes, set up 09/2012 with her daughter. Has not sold anything since 2016, which was only two dozen cupcakes. Business has only lost money and is not active. All equipment used was wife's personal property.**

# APPENDIX B

## Determination of Missing Estate Property
## (Exhibit H)

| Exhibit H Item of Missing Property | Missing Estate Property | Category |
|---|---|---|
| Reel (for air compressor) | Yes | Household goods and furnishings |
| Air Hose (for compressor) | Yes | Household goods and furnishings |
| Large Samsonite Luggage Olive Color | Yes | Household goods and furnishings |
| Large 62-inch Hampton Bay Ceiling Fan with Lights and Remote | Yes | Household goods and furnishings |
| 2 Island Kitchen Pendant Lights | Yes | Household goods and furnishings |
| Lenox Christmas Annual Mickey Mouse Plates | Yes | Household goods and furnishings |
| Diamond Engagement Ring | No | |
| Makeup Bag | No | |
| Silver Hoop Earrings | No | |
| Pack of Contacts | No | |
| Flower Cloth Purse | No | |
| Personal Supplies (shampoo, conditioner, face wash, toothbrush, toothpaste, tins unit for back pain, deodorant) | No | |
| Full Propane Tank | Yes | Household goods and furnishings |
| King Size Chenille Bedspread, White | Yes | Household goods and furnishings |
| Large Rubbermaid Trash Can with Wheels | Yes | Household goods and furnishings |
| Large 24ct Commercial Metal Cupcake Pan | Yes | Household goods and furnishings |
| Granddaughter's Clothes, Pajamas, Kitty Jacket, Socks, Panties, Pants and Tops | No | |
| Set of 6 Large Mikasa Christmas Crystal Glasses | Yes | Household goods and furnishings |
| Set of 6 Small Mikasa Christmas Crystal Glasses | Yes | Household goods and furnishings |
| Guitar Stand | No | |
| Panini Press | Yes | Household goods and furnishings |
| Ice Cream Maker | Yes | Household goods and furnishings |
| Pizzelle Press | Yes | Household goods and furnishings |
| Glass Cake Plate with Dome Top | Yes | Household goods and furnishings |
| 2 Large Red Christmas Platters | Yes | Household goods and furnishings |
| 6 Effanbee Wizard of Oz Dolls | No | |

## Determination of Damaged Estate Property
## (Exhibit I)

| Exhibit I Item of Damaged Property | Damaged Estate Property | Category |
|---|---|---|
| Bathroom Vanity Mirror | Yes | Household goods and furnishings |
| Santas Musical Workshop/Animated | Yes | Electronics |
| Broom with Rubber Head | Yes | Household goods and furnishings |
| Bush Hansen Cherry Rolling File Cabinet | Yes | Household goods and furnishings |
| Hockey Monopoly Game | Yes | Not scheduled |
| Full Body Chair Massager | Yes | Household goods and furnishings |
| Gunmater Universal Gun Cleaning Case | Yes | Not scheduled |
| 5 Tier Wooden White Cupcake Stand | Yes | Household goods and furnishings |
| Kids Bright Steps Musical Learning Toy | Yes | Electronics |
| 8 Container Store Clear Drop Lid Shoe Containers | No | |
| Bissell Steam Cleaner | Yes | Household goods and furnishings |
| Staples 2 Piece Hansen Cherry Business Series Desk | Yes | Household goods and furnishings |
| 9 Ft White Flock Christmas Garland | Yes | Household goods and furnishings |
| Christmas Centerpiece Santa with Reindeer | Yes | Household goods and furnishings |
| Grinch Wreath | Yes | Household goods and furnishings |
| Snowman Centerpiece | Yes | Household goods and furnishings |
| Picture Sew[n] by Johns Grandmother Letter (T) | Yes | Collectibles of value |
| Yearbooks and Bible | Yes | Collectibles of value |
| Shot Glasses and Steins | Yes | Household goods and furnishings |
| Spectrum Remotes and Damage to Boxes and Late Fees | No | |

# APPENDIX C

## Comparison of Values

### (Exhibits H & I Replacement Cost Figures v. Schedule A/B Aggregate Categorical Fair Market Values)

| Item of Property | Missing or Damaged | Property Category | Replacement Cost Assigned by Debtor | Scheduled Fair Market Value for All Property Within Category |
|---|---|---|---|---|
| Reel (for air compressor) | Missing | Household goods and furnishings | 70.00 | $3,000.00* |
| Air Hose (for compressor) | Missing | Household goods and furnishings | 40.00 | *(amount covers not only the items listed to the left, but also at least the following additional items which are not listed to the left: toaster, mixer, refrigerator, washer/dryer, kitchen table with chairs, dining room table with chairs, recliner, love seat, couch, end table, coffee table, 3 beds, 2 dressers, 3 nightstands, chest of drawers, 2 chairs, storage unit, grill, lawn mower, outdoor power tools, hand tools, power tools, and misc. tools and equipment) |
| Large Samsonite Luggage Olive Color | Missing | Household goods and furnishings | 140.00 | |
| Large 62-inch Hampton Bay Ceiling Fan with Lights and Remote | Missing | Household goods and furnishings | 100.00 | |
| 2 Island Kitchen Pendant Lights | Missing | Household goods and furnishings | 300.00 | |
| Lenox Christmas Annual Mickey Mouse Plates | Missing | Household goods and furnishings | 70.00 | |
| Full Propane Tank | Missing | Household goods and furnishings | 35.00 | |
| King Size Chenille Bedspread, White | Missing | Household goods and furnishings | 90.00 | |
| Large Rubbermaid Trash Can with Wheels | Missing | Household goods and furnishings | 75.00 | |
| Large 24ct Commercial Metal Cupcake Pan | Missing | Household goods and furnishings | 45.00 | |
| Set of 6 Large Mikasa Christmas Crystal Glasses | Missing | Household goods and furnishings | 150.00 | |
| Set of 6 Small Mikasa Christmas Crystal Glasses | Missing | Household goods and furnishings | 120.00 | |
| Panini Press | Missing | Household goods and furnishings | 60.00 | |
| Ice Cream Maker | Missing | Household goods and furnishings | 45.00 | |
| Pizzelle Press | Missing | Household goods and furnishings | 50.00 | |
| Glass Cake Plate with Dome Top | Missing | Household goods and furnishings | 20.00 | |
| 2 Large Red Christmas Platters | Missing | Household goods and furnishings | 40.00 | |
| Bathroom Vanity Mirror | Damaged | Household goods and furnishings | 25.00 | |
| Broom with Rubber Head | Damaged | Household goods and furnishings | 20.00 | |
| Bush Hansen Cherry Rolling File Cabinet | Damaged | Household goods and furnishings | 199.00 | |
| Full Body Chair Massager | Damaged | Household goods and furnishings | 70.00 | |
| 5 Tier Wooden White Cupcake Stand | Damaged | Household goods and furnishings | 100.00 | |
| Bissell Steam Cleaner | Damaged | Household goods and furnishings | 239.00 | |
| Staples 2 Piece Hansen Cherry Business Series Desk | Damaged | Household goods and furnishings | 490.00 | |
| 9 Ft White Flock Christmas Garland | Damaged | Household goods and furnishings | 20.00 | |
| Christmas Centerpiece Santa with Reindeer | Damaged | Household goods and furnishings | 150.00 | |
| Grinch Wreath | Damaged | Household goods and furnishings | 100.00 | |
| Snowman Centerpiece | Damaged | Household goods and furnishings | 100.00 | |
| Shot Glasses and Steins | Damaged | Household goods and furnishings | no value assigned | |
| | | Categorical Totals: | $2,963.00 | $3,000.00 |

| Item of Property | Missing or Damaged | Property Category | Replacement Cost Assigned by Debtor | Scheduled Fair Market Value for All Property Within Category |
|---|---|---|---|---|
| Santas Musical Workshop/Animated | Damaged | Electronics | 199.00 | 2,500.00* |
| Kids Bright Steps Musical Learning Toy | Damaged | Electronics | 40.00 | *(amount covers not only the items listed to the left, but also additional items – see App. A) |
| | | Categorical Totals: | $239.00 | $2,500.00 |
| Picture Sew[n] by Johns Grandmother Letter (T) | Damaged | Collectibles of value | no value assigned | $500.00 |
| Yearbooks and Bible | Damaged | Collectibles of value | no value assigned | |
| | | Categorical Totals: | ---- | $500.00 |
| Hockey Monopoly Game | Damaged | Not scheduled | 59.00 | --- |
| Gunmater Universal Gun Cleaning Case | Damaged | Not scheduled | 50.00 | --- |
| | | Categorical Totals: | $109.00 | |